United States Courts
Southern District of Texas
FILED
February 02, 2024
Nathan Ochsner, Clerk of Court

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA** § § | |
| v. § § § | **Criminal No. 18-CR-368** |
| **RONNIE MCADA, JR.,** § § § | |
| Defendant. § | |

**SUPERSEDING INFORMATION**

The United States Attorney for the Southern District of Texas charges:

**General Allegations**

At all times material to this Superseding Information, unless otherwise specified:

**Compounded Drugs**

1. Compounded pharmaceuticals were drugs that were combined, mixed, or altered from other drugs by licensed pharmacists or other licensed practitioners, pursuant to valid prescriptions issued by licensed medical professionals, including physicians, physicians' assistants, and nurse practitioners ("prescribers"), to meet the specific needs of individual patients.

2. Although ingredients in compounded medications were generally approved by the United States Food and Drug Administration ("FDA"), the compounded form of those medications were not. That is, the FDA did not verify the safety, potency, effectiveness, or manufacturing quality of compounded drugs.

**Health Care Benefit Programs**

*Commercial Insurance*

3. Commercial insurance companies provided health care benefits for individuals enrolled with their plans, often referred to as "members." These private insurance companies were

1

"health care benefit programs" as defined by Title 18, United States Code, Section 24(b), that affected commerce.

4. Commercial insurance companies, employers, and private entities offered drug plans, which were administered and operated by Pharmacy Benefit Managers ("PBMs"). A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network.

5. A member of a privately insured drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

6. Express Scripts, Inc. ("Express Scripts" or "ESI"); Caremark LLC, doing business as ("d/b/a") CVS/Caremark ("CVS/Caremark"); and Prime Therapeutics, LLC were PBMs, and were health care benefit programs, as defined by Title 18, United States Code, Section 24(b), that affected commerce.

*The TRICARE Program*

7. TRICARE was a health care program of the United States Department of Defense ("DOD") Military Health System that provided coverage for DOD beneficiaries worldwide, including active-duty service members, National Guard and Reserve members, retirees, their families, and survivors. Individuals who received health care benefits through TRICARE were referred to as TRICARE "beneficiaries." The Defense Health Agency ("DHA"), an agency of DOD, was the military entity responsible for overseeing and administering TRICARE.

8. TRICARE provided coverage for certain prescription drugs, including certain compounded drugs that were medically necessary and prescribed by a licensed medical professional.

9. In or around May 2015, the DHA implemented a new screening procedure to ensure

that TRICARE-covered compounded drugs were safe, clinically necessary, and cost effective, which resulted in a steep decline in TRICARE's reimbursements for compounded drugs.

10.     TRICARE beneficiaries could fill their prescriptions through military pharmacies, TRICARE's home delivery program, network pharmacies, and non-network pharmacies. Once a beneficiary filed a prescription, the pharmacy would collect any applicable copay from the beneficiary, dispense the drug to the beneficiary, and submit a claim for reimbursement to Express Scripts, the PBM that administered TRICARE's prescription drug benefits, which would, in turn, adjudicate the claim and reimburse the pharmacy directly or through a Pharmacy Services Administrative Organization ("PSAO"). To become a network pharmacy, a pharmacy agreed to be bound by, and comply with, all applicable State and Federal laws, specifically including those addressing fraud, waste, and abuse.

11.     TRICARE was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

*The Medicare Program*

12.     The Medicare Program ("Medicare") was a federal health care program providing benefits to individuals who were 65 years or older or disabled. The United States Department of Health and Human Services, through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

13.     Medicare programs covering different types of benefits were separated into different program "parts." Medicare Part D ("Part D") subsidized the costs of prescription drugs for Medicare beneficiaries in the United States.

14.     To receive Part D benefits, a beneficiary enrolled in a Medicare drug plan.

Medicare drug plans were operated by private companies that Medicare approved, often referred to as drug plan "sponsors." A beneficiary in a Medicare drug plan could fill a prescription at a pharmacy and use his or her plan to pay for some or all of the prescription.

15. A pharmacy could participate in Part D by entering into a retail network agreement directly with a plan or with one or more PBMs. A PBM acted on behalf of one or more drug plans. Through a plan's PBM, a pharmacy could join the plan's network. Express Scripts and CVS/Caremark, among others, were Medicare drug plan sponsors.

16. When a Part D beneficiary presented a prescription to a pharmacy, the pharmacy submitted a claim either directly to the plan or to a PBM that represented the beneficiary's Medicare drug plan. The plan or PBM determined whether the pharmacy was entitled to payment for each claim and periodically paid the pharmacy for outstanding claims. The drug plan's sponsor reimbursed the PBM for its payments to the pharmacy.

17. Medicare, through CMS, compensated the Medicare drug plan sponsors. Medicare paid the sponsors a monthly fee for each Medicare beneficiary of the sponsors' plans, which was adjusted periodically based on various factors, including the beneficiary's medical conditions. In addition, in some cases in which a sponsor's expenses for a beneficiary's prescription drugs exceeded that beneficiary's monthly fee, Medicare reimbursed the sponsor for a portion of those additional expenses.

18. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), that affected commerce.

### Claims Adjudication

19. Providers, including pharmacies, entered into contractual relationships with PBMs either directly or indirectly. If indirectly, providers first contracted with pharmacy network groups,

or PSAOs, which then contracted with PBMs on behalf of providers. Providers, whether directly or indirectly, by contracting with PBMs, agreed to comply with all applicable laws, rules, and regulations, including all applicable federal and state anti-kickback laws.

20. For prescription drugs, including compounded medications, to be reimbursed, health care benefit programs required that they be dispensed pursuant to a valid prescription and be medically necessary for the treatment of covered illnesses or conditions.

21. Copayments set by the health care benefit programs were the monetary amounts or percentages paid by beneficiaries and members for health care services and items received.

22. Most, if not all, PBMs required participating pharmacies to collect and make good faith efforts to collect copayments from beneficiaries and members at the time of billing, and specified that copayments could not be systematically waived or reduced, in part because consistent copayment collection was a fraud prevention measure. Specifically, copayments gave beneficiaries and members financial incentives to reject medications that were not medically necessary or had little to no value to their treatments.

23. Upon receiving prescriptions and dispensing prescription drugs, pharmacies submitted claims to health care benefit programs or PBMs. Health care benefit programs or PBMs reimbursed pharmacies at specified rates, minus any copayments to be paid by beneficiaries.

### Relevant Entities

24. Pharms, LLC ("Pharms"), a Texas Limited Liability Company, was a management company formed in or around June 2013.

25. OmniPlus Healthcare, L.P.; Alternative Medicine and Pharmacy, Inc., d/b/a OmniPlus Pharmacy; Omni-One-Med Pharmacy Services, LLC; Safety and Health Technology, LLC, d/b/a Accu-Care Pharmacy; Healthy Pharmacy Solutions, Inc.; Kremco Pharmacy, LLC,

d/b/a Kremco Pharmacy; and JSW Prosperity, LLC, d/b/a 1 Stop Pharmacy (collectively "the Pharmacies") were licensed pharmacies formed, acquired, or purchased between in or around 2013 and in or around 2016.  Many of the Pharmacies were held by holding companies, which were Texas Limited Liability Companies.

**The Defendant and Coconspirators**

26. Defendant **RONNIE MCADA, JR.** ("**MCADA**"), a resident of Sunnyvale, Texas, was a sales representative.  **MCADA** owned Elite Health Providers, LLC and Medallion Health Group, LLC.

27. Brian Swiencinski ("Swiencinski"), a resident of Dallas, Texas, owned Worth Medical ("Worth").  Swiencinski and others owned or controlled Pharms, the Pharmacies, and other related business entities located in or around Houston, Texas.

28. Scott Breimeister ("Breimeister"), a resident of Houston, Texas, owned or controlled Pharms, the Pharmacies, and other related business entities located in or around Houston, Texas with Swiencinski and others.

29. Dr. Colleen Kennedy ("Dr. Kennedy"), a resident of Dallas, Texas, was a physician licensed to practice medicine in the State of Texas with a primary specialty in general surgery and a practice in bariatrics and general surgery.

**COUNT ONE**
**Conspiracy to Pay and Receive Health Care Kickbacks and**
**to Make False Statements Relating to Healthcare Matters**
**(18 U.S.C. § 371)**

30. Paragraphs 1 through 29 of this Superseding Information are realleged and incorporated by reference as though fully set forth herein.

31. Beginning in or around October 2013 and continuing through in or around October 2014, the exact dates being unknown, in the Houston Division of the Southern District of Texas

6

and elsewhere, the Defendant

## RONNIE MCADA, JR.,

did knowingly and willfully combine, conspire, confederate, and agree with others known and unknown, including Brian Swiencinski, Scott Breimeister, Dr. Colleen Kennedy, and others, to commit certain offenses against the United States, that is:

    a.    to violate Title 42, United States Code, Section 1320a-7b(b)(l)(B), by knowingly and willfully soliciting and receiving remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, in return for purchasing, leasing, ordering, and arranging for and recommending the purchasing, leasing, and ordering of any good, service, and item for which payment may be made in whole and in part by a Federal health care program;

    b.    to violate Title 42, United States Code, Section 1320a-7b(b)(2)(B), by knowingly and willfully offering and paying remuneration, specifically, kickbacks and bribes, directly and indirectly, overtly and covertly, to any person to induce such person to purchase, lease, order, and arrange for and recommend the purchasing, leasing and ordering of any good, service, and item for which payment may be made in whole and in part by a Federal health care program; and

    c.    to violate Title 18, United States Code, Section 1035, by knowingly and willfully making, and causing others to make, materially false, fictitious, and fraudulent statements and representations, in connection with the delivery of and payment for health care benefits, items, and services involving a health care benefit program, as defined in Title 18, United States Code, Section 24(b), specifically CVS/Caremark, a PBM administering a prescription drug plan for commercial insurance.

**Purpose of the Conspiracy**

32. It was an object and purpose of the scheme for Swiencinski, Breimeister, **MCADA** and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, paying and receiving kickbacks and bribes in exchange for the referral of beneficiaries for whom the Pharmacies submitted claims to Federal health care benefit programs, including TRICARE and Medicare.

33. It was an object and purpose of the scheme for Swiencinski, Breimeister, **MCADA** and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, (a) concealing material information from health care benefit programs to induce said programs to reimburse fraudulent claims submitted by the Pharmacies and (b) providing materially false information to health care benefit programs in response to audits and investigations.

34. It was an object and purpose of the scheme for Swiencinski, Breimeister, **MCADA** and their coconspirators, known and unknown, to unlawfully enrich themselves by, among other things, submitting or causing the submission of false and fraudulent claims to health care benefit programs, that is, Medicare, TRICARE, and other Federal and private health care benefit programs, generally administered by PBMs, for compounded and other drugs that were often medically unnecessary, not provided or not provided as billed, based on an invalid prescriber-patient relationship, induced by kickbacks or bribes, or dispensed in violation of state licensing requirements.

**Manner and Means of the Conspiracy**

35. The Pharmacies formulated, mixed, and dispensed compounded drugs, "kits," "patches," and other drugs (collectively "compounded and other drugs") not based on individualized patient need, but instead based on formulas designed to maximize reimbursements

from Federal and private health care benefit programs.

36. To increase reimbursements, Swiencinski, who was himself a sales representative, oversaw a national network of hundreds of other sales representatives, including **MCADA**, and others who marketed compounded and other drugs.

37. Sales representatives, including Swiencinski, **MCADA**, and others, were financially incentivized through kickbacks and bribes, often disguised as commission payments, that were usually based on the reimbursements from Federal and private health care benefit programs, administered by the PBMs, to the Pharmacies for compounded and other drugs.

38. To further increase reimbursements, Swiencinski, Breimeister, and their coconspirators, and other sales representatives, often directed prescribers, including Dr. Kennedy, to prescribe and sign off on prescriptions for compounded and other drugs that were often not eligible for reimbursement.

39. Also to increase reimbursements, Swiencinski, and other employees and sales representatives signed up themselves, their families, and others to receive compounded and other drugs that were often not eligible for reimbursement. Dr. Kennedy and others signed or purportedly signed these prescriptions, many times without seeing or treating the recipient.

40. The PBMs occasionally audited or investigated the Pharmacies, the prescribers, and the recipients who had purportedly been prescribed compounded or other drugs. At various times, Swiencinski, Breimeister, Dr. Kennedy, and others conspired to and did provide false information in response to these audits and investigations.

41. The Pharmacies submitted claims electronically to Federal and private health care benefit programs, generally through PBMs, seeking reimbursement for the compounded and other drugs they purportedly dispensed. Those health care benefit programs, including the PBMs, in

turn, reimbursed the Pharmacies' claims in reliance on representations that the drugs dispensed were provided as billed, based on valid prescriptions and prescriber-patient relationships, not induced by kickbacks or bribes, and dispensed in accordance with state licensing requirements.

42. Swiencinski, **MCADA**, and other sales representatives referred themselves and their families, friends, and others to receive compounded and other drugs that were often based on invalid prescriptions.

43. Swiencinski, **MCADA**, and other sales representatives were paid sales commissions on a monthly basis based on these prescriptions for which the PBMs reimbursed the Pharmacies, even though Swiencinski, **MCADA**, and other sales representatives knew that these prescriptions were ineligible for reimbursement.

44. Breimeister and others signed off on other sales commission checks paid to Swiencinski, **MCADA**, and other sales representatives and their associated entities to induce the referral of prescriptions for compounded and other drugs that would be paid for by Federal and private health care benefit programs.

45. Between in or around October 2013 and in or around October 2014, **MCADA** caused the submission of approximately $481,212.10 in fraudulent claims to health care benefit programs for compounded drugs and other drugs based on Dr. Kennedy's prescriptions to himself and members of his family.

## Overt Acts

46. In furtherance of the conspiracy, and to accomplish its object and purpose, **MCADA** and his coconspirators committed and caused to be committed, in the Houston Division of the Southern District of Texas and elsewhere, the following overt acts:

   a. Between in or around October 2013 and in or around October 2014,

**MCADA** personally marketed compounded drugs and other pharmaceuticals to Dr. Kennedy and other doctors with the intent to unlawfully enrich himself by receiving kickbacks and bribes in exchange for referring beneficiaries to her.

b.      At some point in or around late 2013, **MCADA** requested that Dr. Kennedy sign off on prescriptions for himself (i.e., Defendant) and individuals known to **MCADA**, including members of **MCADA**'s own family. **MCADA** brought prescriptions which already had compounded pharmaceutical formulations on them to Dr. Kennedy for her signature.

c.      On or about October 28, 2014, **MCADA** requested that Breimeister send a complete list of prescriptions being audited by CVS/Caremark to Dr. Kennedy along with a link to copies of the original prescriptions.

d.      On or about November 18, 2014, Breimeister e-mailed **MCADA** regarding the CVS/Caremark audit, asking **MCADA** to "kick [Dr. Kennedy] in the butt and ask her to get this resolved once and for all with CVS" and that the matter was "costing [them] both a fortune."

e.      In or about November 2014, **MCADA** called Dr. Kennedy and told her that the prescriptions at issue in the audit were not fabricated by the pharmacy and that Dr. Kennedy did, in fact, issue the prescriptions.

f.      On or about November 21, 2014, **MCADA** went to Dr. Kennedy's residence to assist her in responding to the CVS/Caremark audit. Dr. Kennedy called a CVS/Caremark representative involved in the audit with her phone's audio on "speaker" so **MCADA** could assist her in responding to questions. Dr. Kennedy represented that the prescriptions she initially denied writing were legitimate prescriptions from her office.

During the call, Dr. Kennedy was questioned about prescriptions for scar cream that she issued to **MCADA**'s relative. **MCADA** knew that Dr. Kennedy had not evaluated his relative or seen him as a patient. **MCADA** told Dr. Kennedy during the call that his relative had a scar on his face. Dr. Kennedy then repeated this information to the CVS/Caremark representative, further supporting the false assertion that Dr. Kennedy had actually treated Individual 1 as a patient.

      g.     **MCADA** gave Dr. Kennedy and her staff various gifts during the course of the conspiracy.

All in violation of Title 18, United States Code, Section 371.

## NOTICE OF CRIMINAL FORFEITURE
### (18 U.S.C. § 982(a)(7))

47.  Pursuant to Title 18, United States Code, Section 982(a)(7), the United States of America gives notice to the defendant **RONNIE MCADA, JR.** that, upon conviction of Count One, all property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of such offense is subject to forfeiture.

### Money Judgment and Substitute Assets

48.  Defendant **RONNIE MCADA, JR.** is notified that upon conviction, a money judgment may be imposed against the defendant. In the event that one or more conditions listed in Title 21, United States Code, Section 853(p) exists, the United States will seek to forfeit any other property of the defendant up to the amount of the money judgment.

ALAMDAR S. HAMDANI
United States Attorney

GLENN S. LEON
Chief
Fraud Section
U.S. Department of Justice

NICHOLAS K. PEONE
KELLY M. WARNER
Trial Attorneys
Fraud Section, Criminal Division
U.S. Department of Justice
Telephone: (202) 923-7818
E-mail: nicholas.peone@usdoj.gov